Stephen **BAUMAN, et als., Plaintiffs,**

v.

**Walter F. BISH, et als., Defendants.**

**Civ. A. No. 82–90–W.**

United States District Court,
N.D. West Virginia,
Wheeling Division.

Sept. 23, 1983.

Straughton Lynd, Northeast Ohio Legal Services, Youngstown, Ohio, Allan N. Karlin, Morgantown, W.Va., James D. McNamara, Southeastern Ohio Legal Services, Steubenville, Ohio, Arthur Z. Schwartz, Hall, Clifton & Schwartz, New York City, for plaintiffs.

Bogarad & Robertson, Weirton, W.Va., for defendants, Bush and ISU.

Anthony F. Phillips, Gerald Kerner, Wilkie, Farr & Gallagher, New York City, for defendant, Joint Study Committee.

## MEMORANDUM OPINION AND ORDER

MAXWELL, Chief Judge.

Plaintiffs commenced this action in October, 1982, to establish a right of access to certain information allegedly relevant to a proposed employee buy-out, which includes an Employee Stock Ownership Plan (ESOP) for the Weirton Steel Division of National Steel Corporation. This Court has faced many issues regarding the employee buy-out in this and other civil actions. This civil action is now before the Court on motions for summary judgment by all Defendants and a motion for preliminary injunction by Plaintiffs.

The record includes the various pleadings and motions in the case file; testimony and exhibits adduced at hearings held November 5, 1982, and April 27 and September 20, 1983; affidavits submitted in support and opposition to the instant motions and earlier motions; and other matters of record. From an examination of these items, the Court finds the following facts:

The Weirton Division of National Steel is an integrated steel mill which produces hot-rolled and cold-rolled galvanized and electroplated sheet steel and a full line of tin mill products. Historic peak employment at Weirton Steel Division was 16,000 following World War II, but the employment level has dwindled to some 8,000 currently.

In early 1982, National Steel announced that it would no longer make capital investments in its Weirton Division and that it would "downsize" the facility to a finishing operation with total employment reduced to 2,000 or fewer persons. However, the Corporation also indicated willingness to discuss purchase of the Division's assets by its employees.

Shortly after the announcement by National Steel, two of the unions representing employees at Weirton Division joined management employees at the Division to form the Weirton Joint Study Committee to investigate and determine the course of transition to proposed employee ownership. The Committee's board of directors has twenty-one representatives of the Independent Steelworkers Union; three representatives of the Independent Guard Union; and five management representatives. All persons on the board are directors by virtue of offices they hold with the organizations they represent.

The Joint Study Committee has operated using funds provided by a grant from the State of West Virginia, by contributions from the unions and the Division's management personnel, and by gifts from community members.

The Weirton Steel Division is the largest private-sector employer in the State of West Virginia. If the proposed employee buy-out becomes reality, the new entity will be the largest employee-owned company in the country. Many complex problems faced the Committee as it moved through a feasibility study phase and into making actual plans for the employee-owned venture.

The Committee retained several consulting firms having nationally-recognized expertise in the areas for which they were hired. These include the economic consulting firm of McKinsey & Co., of Washington, D.C., to conduct a feasibility study on the economic viability of an employee-owned steel company; the law firm of Ludwig & Curtis, of San Francisco, to advise on the structure of an employee stock ownership plan; the law firm of Wilkie, Farr & Gallagher of New York, to represent the Committee and the new entity in negotiations with National Steel and prospective financeers; the investment banking firm of Lazard Freres & Co., of New York, to assist in evaluating financial problems and in obtaining financing; the accounting firm of Towers, Perrin, Forster & Crosby, of Pittsburgh, to conduct an audit of pension calculations, and others.

McKinsey & Co. was one of the first consulting firms retained. Hired in April, 1982, the firm utilized data supplied by management of the Division and its own internal sources to conduct the feasibility analysis. In July, 1982, McKinsey & Co. announced the results of its study in a three-part report: A summary letter; a fifty-six page document entitled "Assessing the Feasibility of an Independent Weirton Steel," and a so-called confidential appendix. The report concludes that an employee-owned venture could succeed if production costs were reduced, if labor costs were reduced by 32%, if substantial capital improvements were made over a ten-year period, and if management and labor could forge the leadership necessary to shape and direct the new entity.

Although the fifty-six page report contains a substantial amount of data, the confidential appendix contains further data utilized by the staff of McKinsey & Co. to complete its analysis. It appears the appendix includes cost information, largely cost of equipment and production data, which McKinsey & Co. assembled from study of every major steel making facility in the world. The firm has developed a computerized steel industry model, using the cost production information as a data base, which McKinsey staff use to analyze a client's cost of production in relation to its competition, on a step-by-step basis.

It is undisputed that the confidential appendix has not been released and circulated either to Joint Study Committee members or the membership of either union. The only complete copy of the confidential appendix released by McKinsey & Co. was delivered to Wilkie Farr & Gallagher, the law firm retained by the Committee. (An edited version was supplied to the investment banking firm retained by the Joint Study Committee.) During the hearing on the instant motions held September 20, 1983, at the Wheeling point of holding court, Plaintiffs called Anthony Phillips as a witness. Mr. Phillips, one of the attorneys representing Defendant Joint Study Committee, refused to voluntarily produce the confidential appendix for Plaintiffs. However, pursuant to the direction of the Court, Mr. Phillips produced a copy of the confident appendix as an exhibit. The document was immediately sealed and made a part of the record for appellate purposes only.

The information contained in the appendix was presented orally and by charts to the Joint Study Committee and McKinsey staff spent two days in informational meetings with Weirton employees where the entire report was discussed, and questions answered. Employees were also invited to send follow-up questions to McKinsey & Co. Approximately six questions were received and answered.

The McKinsey report recommends an initial 32% compensation reduction for all employees. It is recommended that wages and benefits be reduced by 20% to aid cash flow for the new company and 12% be deferred to aid in equity financing for needed capital investments. Plaintiffs contend that the released portions of the report contains "naked, unsubstantiated assertions that the proposed 32% reduction in compensation is the only way to ensure the viability of a new employee-owned company." In argument to the Court, Plaintiffs have said they cannot adequately evaluate the proposed 32% compensation reduction without a detailed analysis of Weirton's costs of producing finished products in comparison with other U.S. steel companies and without a

detailed list of capital improvements (and their costs) which McKinsey & Co. recommends to maintain and improve operations at Weirton.

In contrast, Defendants contend that the cost information in the confidential appendix is sensitive. They argue that the economic and cost information in the released portions of the report is summary in nature in order to avoid revealing enough detail to allow competitors to predict the precise business strategy of the new company, thus rendering corporate planning ineffectual. In addition, Defendants argue that the consulting firm, McKinsey & Co., which has gathered the data underlying the analysis made public, has a strong proprietary interest in keeping the comparative equipment and cost information confidential.

In March, 1983, negotiators for the Joint Study Committee and National Steel announced an agreement in principle on the terms of sale of the Weirton Division. The agreement sets forth provisions for a current assets purchase price; a fixed assets purchase price; a division of liabilities for pension benefits and other benefit programs for active and retired workers; property transfers, and other matters.

In April, 1983, the Independent Steelworkers Union released information to the membership revealing that the terms of sale by which National would remain liable for its pro rata share of pension and other employee benefit programs reduces the 32% reduction in compensation recommended by McKinsey & Co. by 13.17%. This means that compensation for future employment with the new company will only need be reduced by slightly less than 19% in order to meet the McKinsey & Co. recommendation for hourly workers. (The actual reduction in compensation to be taken by an individual employee depends on category of employment. It ranges from 20.90% for salary, non-exempt members of the Independent Steelworkers Union to 6.89% for a group labeled excluded, salary, non-exempt.)

The terms of sale as announced will necessitate amendments to collective bargain-

ing agreements now in existence with National Steel Corporation. In addition, compensation, working conditions, and other matters of concern between the unions and the new, proposed employer will differ from existing agreements. Thus, acceptance of the proposed employee-owned company—its structure, employee relations, etc.—is subject to an approving vote by the unions involved.

Though this civil action was filed in October, 1982, the Court has ruled on several prior occasions that no ripe controversy between the parties exists. In brief, the Court found that no concrete proposal was before the membership of Defendant Independent Steelworkers Union and no final package of information on the proposal was prepared by the union leadership and presented to the membership. The "disclosure document" was released August 19, 1983, and a "disclosure document appendix" was released in early September. The release of the disclosure document and its appendix, the preparation of information on proposed collective bargaining agreements by the unions involved for the use of their memberships, and the scheduling of a vote on the proposals discussed in these materials makes this controversy ripe for adjudication.

There is extensive information on justification for the proposed compensation reductions for all employees of the new company in the portions of the McKinsey & Co. report earlier released; in the disclosure document; and in the disclosure document appendix. However, the language of the disclosure document makes clear that the confidential appendix sought by Plaintiffs will not be voluntarily revealed to the membership of any union or other employee group.

DEFINING THE ISSUE

Although six distinct causes of action remain before the Court, a fair reading of the second amended and supplemental complaint reveals that the sole purpose of this litigation is to obtain what has been labeled as a confidential appendix to a study entitled "Assessing the Feasibility of an Independent Weirton Steel." The six causes of action, then, are alternative theories for recovery. The central issue is whether Plaintiffs have a "right" to examine the confidential appendix. The Court will explore whether such a right arises from a union member's right to an informed vote as embodied in 29 U.S.C. § 411(a)(1) (Plaintiffs' first cause of action); whether denial of access to the appendix would infringe a union member's right to express views and opinions as guaranteed by 29 U.S.C. § 411(a)(2) (second cause of action); and whether the Union president's denial of the appendix violates any fiduciary duty of trust under 29 U.S.C. § 501 (fifth cause of action). The Court's examination of the issue naturally touches areas of labor law not specifically raised by the complaint, such as an employer's duty to supply a union with information in certain circumstances as embodied in 29 U.S.C. § 158(a)(5) and (d).

The common law duties of agency alleged in the third and fourth causes of action are essentially embodied in the federal labor statutes invoked in other causes of action. *Brink v. DaLesio*, 453 F.Supp. 272, 278 (D.Md.1978). *See* 29 U.S.C. § 401(b). *See generally, Local No. 92 v. Norris*, 383 F.2d 735, 741 (5th Cir.1967) (fiduciary responsibilities under § 501 analogous to those of a trustee); *International Union v. N.L.R.B.*, 307 F.2d 679, 683 (D.C.Cir.), *cert. denied*, 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270 (1962) (duties of an agent imposed by National Labor Relations Act). Since the issues of agency duty are presented wholly in the context of an intra-union dispute, there is no reason to conduct an examination of duties of an agent beyond those imposed by federal labor law. For reasons stated below, the Court has concluded that the Securities Acts invoked in the sixth cause of action are not applicable to the issues of this lawsuit. Therefore, the theories presented in the third, fourth, and sixth causes of action will not be examined in light of the facts.

GENERAL PRINCIPLES

The Court believes that neither the operative facts nor the inferences to be drawn

from them are in dispute. *See Morrison v. Nissan Co., Ltd.,* 601 F.2d 139 (4th Cir.1979). Therefore, the Court's duty is to determine whether Plaintiff or Defendants are entitled to relief under either 29 U.S.C. §§ 411 or 501 as a matter of law.

■ Courts should not be hasty to interfere in internal union affairs. Duly elected officers of a union have a responsibility to lead and to give the members the benefit of their advice on questions that arise. A court should only interfere with the judgment of union officials at the behest of members when the official's action is not fair or reasonable. *See Newman v. Local 1101,* 570 F.2d 439, 445–446 (2nd Cir.1978) (29 U.S.C. § 411 case); *Blanchard v. Johnson,* 532 F.2d 1074, 1078 (6th Cir.), *cert. denied,* 429 U.S. 869, 97 S.Ct. 180, 50 L.Ed.2d 149 (1976) (29 U.S.C. §§ 411, 501 case); *Kahn v. Hotel & Rest. Emp., etc.,* 469 F.Supp. 14, 19 (N.D.Cal.1977), *aff'd,* 597 F.2d 1317 (9th Cir.1979) (29 U.S.C. §§ 411, 501 case).

The management of a proposed, independent Weirton Steel Company has a viable interest in maintaining flexibility and secrecy in planning operational strategies and in meeting business opportunities and exigencies. *See First National Maintenance Corp. v. N.L.R.B.,* 452 U.S. 666, 682–683, 101 S.Ct. 2573, 2582–2583, 69 L.Ed.2d 318 (1981). Plaintiffs' interest in disclosure of information should be weighed against the proposed company's interest in secrecy and the Court should consider the harm which would flow both from disclosure and from failure to disclose, provided there is a reasonable showing of need for confidentiality in the subject information. *See generally, Detroit Edison v. N.L.R.B.,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979).

This civil action does not fit the usual mold of actions under 29 U.S.C. §§ 411 or 501 where members sue either the union, its officers, or both. In the instant controversy, the existing employer has announced its intention to "downsize" a major plant, but indicated willingness to discuss an employee takeover. The employees, acting through a union-dominated committee, have taken steps to study the feasibility of such a takeover, and, in turn, to formulate a workable plan and submit it to union employees for a vote. At this juncture, the Joint Study Committee is acting on behalf of both the employees (union and non-union) and on behalf of the proposed employee-owned corporation.

One can easily see the unusual twist. It was the Joint Study Committee who retained McKinsey & Co. and accepted its report without insisting on release of the data in the confidential appendix. In certain circumstances, labor law has been interpreted to require employers to release information labeled confidential that is relevant to collective bargaining. Also, in certain circumstances, it has been held that union officials have a duty to share information with the membership. Here, the entity that might have insisted on the information's release was representing both the union and its membership and the future employer.

In order to view Plaintiffs' cause of action from a most liberal viewpoint, the Court will examine the facts and pertinent law in order to determine if there exists a cause of action against anyone. To do so, the court will ignore for the time being questions on standing; on who does or does not actually possess the information sought; on whether a *proposed* employer has any duties, etc.

PLAINTIFFS' RIGHT TO INFORMATION SOUGHT

■ The "Bill of Rights of Members of Labor Organizations," 29 U.S.C. §§ 411–415, which is a part of the Labor Management Reporting and Disclosure Act, "guarantees to every member of a labor organization equal rights and privileges to vote, to attend meetings, and to participate in the deliberations and business of such meetings." *Musicians Federation v. Wittstein,* 379 U.S. 171, 181, 85 S.Ct. 300, 306, 13 L.Ed.2d 214 (1964). Whenever unions confer a right to vote on any issue, 29 U.S.C. § 411(a)(1) requires that the vote be meaningful and informed. *See Daniels v. Nat.*

*Post Office Mail Handlers,* 454 F.Supp. 336, 339 (E.D.Va.1978).

▮ In addition, the National Labor Relations Act requires employers to bargain in good faith with representatives of employees. 29 U.S.C. § 158(a)(5) and (d). It has been held that a duty to supply the union, upon request, with sufficient information to enable it to understand and intelligently discuss issues raised in bargaining. *N.L.R.B. v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1955). It appears that holdings of the N.L.R.B. and federal courts have fashioned a rule that requests for information in the hands of the employer should be granted where the data sought would be relevant and/or reasonably necessary to the bargaining and negotiating process. *See Detroit Edison Co. v. N.L.R.B.,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). This principle of labor law has been utilized to force disclosure of information labeled "confidential" by the employer. *See, e.g., General Electric Co. v. N.L.R.B.,* 466 F.2d 1177 (6th Cir.1972).

The Court has interpreted the pleadings and argument of Plaintiffs to propose a theory combining the two motions set forth in brief above to urge disclosure of the confidential appendix and the information it contains.

Plaintiffs urge that denial of access to the information also works to deny their right to express views, arguments, or opinions as guaranteed by 29 U.S.C. § 411(a)(2). It is the Court's view, however, that this would merely bolster arguments which can be made on a combination theory to force release of confidential information in connection with a scheduled vote. Naturally, a broader base of information will expand a union member's right to express views and

opinions, however, the Court believes there must be a separate basis to force disclosure of data. As such, the 29 U.S.C. § 411(a)(2) claim in this lawsuit is mere "icing on the cake." [1]

It is the opinion of the Court that Defendants have made a reasonable showing of need for confidentiality in the subject information. In another area of the law, commercial information is said to be "confidential" if its disclosure is likely to cause substantial harm to the competitive position of the person from whom it is sought. *See Green v. Dept. of Commerce,* 468 F.Supp. 691, 692 (D.D.C.1979), *appeal dismissed,* 618 F.2d 836 (D.C.Cir.1980) (Freedom of Information Act). The Court accepts the position of Defendants that revelation of the cost of equipment and of production at National's Weirton Division and at various competing steelmaking facilities around the world would not only work a competitive disadvantage to the proposed employee-owned company, but would also intrude on the proprietary interest of McKinsey & Co. Of course a finding that the information is confidential does not end the inquiry. This is because the Court accepts the position of Plaintiffs that the information sought is relevant to bargaining on issues of compensation between the Union and the proposed employer.

Utilizing some of the authorities cited by Plaintiffs in support of their position, the Court believes it finds a rationale to deny relief. In *General Electric Co. v. N.L.R.B., supra,* 466 F.2d at 1185, the Sixth Circuit suggested that to avoid disclosure of so-called confidential information obtained from surveying employers in the competing labor market, the union and the employer should "agree upon a neutral third party to take the survey whereupon each would be

---

1. The Court would note that Plaintiffs have made arrangements with the Independent Steelworkers Union to have printed material circulated to the entire membership, presumably to circulate their views, arguments, and opinions on matters before the Union. The Court would also note the extensive preparation of leaflets and news releases and conduct of public meetings by the Plaintiff Rank and File Committee detailed in the Affidavit of Wal-

ter F. Bish, given September 8, 1983. The existence of the arrangement of Plaintiffs to circulate information to the full membership of the Independent Steelworkers Union and the apparently unhindered propagation of information to date weigh heavily against the Court finding a viable cause of action under 29 U.S.C. § 411(a)(2) separate from one which would flow from either 29 U.S.C. §§ 411(a)(1) or 501.

given the same quantity of data and the secrecy of the individual employer's data would be maintained." It seems the handling of the confidential data in the instant case closely paralleled the suggestion of the Sixth Circuit. McKinsey & Co. (in essence, a neutral third-party) was hired to conduct the survey, carry out an analysis, and report its findings to both the proposed employer and the representatives of the Union via the Joint Study Committee in a manner that protected the secrecy of the underlying data.

This notion is supported by *General Electric Co. v. N.L.R.B.*, 414 F.2d 918 (4th Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970), where the Fourth Circuit, in part, enforced an agency order requiring the employer to furnish an expert for the union with certain time study data so that he could conduct an analysis and report to the union.

The Court would also note that several courts have fashioned the disclosure of information to unions in alternative forms than that demanded to protect an employer's need for confidentiality. *See Detroit Edison, supra,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333; *Emeryville Research Center v. N.L.R.B.,* 441 F.2d 880 (9th Cir.1971). Alternative remedies can balance the union's interest in disclosure of relevant information against the employer's need for confidentiality. For example, the provision of "aggregate" economic information, rather than revelation of individual salaries of employees, was held to satisfy the union's need for disclosure in *Press Democrat Pub. Co. v. N.L.R.B.,* 629 F.2d 1320 (9th Cir.1980), *on remand sub nom., Times-Herald, Inc.,* 258 NLRB No. 135 (1981).

Thus, reporting the conclusions of an analysis with substantial supporting information in the aggregate via charts and graphs, as was accomplished in the released portions of the McKinsey & Co. report, should satisfy the need of the Union and its membership for an understanding of confidential information.

■ In conclusion, the Court finds nothing wrong with a procedure whereby a union and an employer jointly retain an expert firm to accumulate confidential data, analyze it, and report to both groups via a document that focuses on the conclusions drawn without revealing all of the underlying information.

The Court has thus far discussed information that has not been released to membership of the unions involved. It would probably be well to comment on the extensive nature of information that has not only been revealed in printed form, but amplified at literally dozens of meetings conducted by the Joint Study Committee and the Independent Steelworkers since March 23, 1982, and continuing to the present.

Concentrating on the area of concern in this litigation—justification for the proposed reduction in compensation—the record reveals that the initial proposal to reduce compensation by 32% by consultant McKinsey & Co. was announced by mailing copies of the portions of the McKinsey report made public to each member of the Independent Steelworkers Union. As a follow-up, McKinsey & Co. staff made an oral presentation to the Joint Study Committee and spent two days conducting informational meetings for all types of employees of the Weirton Division, including the Independent Steelworkers Union. (Materials utilized in these presentations are partially presented in the disclosure document appendix.) The Joint Study Committee hired an accounting firm to audit pension calculations conducted by National Steel in anticipation of a transfer of ownership. The firm's report was circulated to the Union membership. A second accounting firm was hired to conduct a study of the wage and benefit structure in effect under National Steel ownership and a summary of that report was forwarded to each member of the Independent Steelworkers Union. After an agreement in principle on the terms of sale between National and an Independent Weirton was negotiated, the Union sent to each member the compensation reduction package being proposed by the Joint Study Committee in April, 1983. Finally, the disclosure document discusses all

of these revelations and extensively discusses the compensation reduction package proposed to take effect should the plan for an independent Weirton be implemented.

Throughout this process, there has been extensive distribution and discussion of economic information directed to predicting potential success for an independent Weirton as envisioned by the McKinsey & Co. staff and by the comprehensive proposal for a transfer of ownership detailed in the disclosure document and its appendix. (Admittedly, some of the information has been in the form of conclusions based on the McKinsey analysis.) With the extensive sharing of information and opportunities for each employee of the Weirton Division to pose questions and get answers as reflected in the record of this litigation, it is impossible for the Court to find that the members of the unions who will vote on September 23, 1983, have been deprived of information to the extent that the vote will not be "meaningful."

THE SECTION 501 CLAIM

■ As indicated earlier, Plaintiff's fifth cause of action alleges Union President Bish has breached a fiduciary duty of trust, under 29 U.S.C. § 501, by failing to disclose information which is essential to decisions Plaintiffs and other members of the Union must make. Of course, the "essential information" is the confidential appendix to the McKinsey & Co. report.

Most courts that have considered the question have interpreted § 501 as establishing fiduciary duties of labor organization officers in all their functions, and not just limited to financially-related fiduciary duties. *Stelling v. Intern. Broth. of Elec. Workers,* 587 F.2d 1379, 1386 (9th Cir.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 3115, *reh'g denied,* 444 U.S. 889, 100 S.Ct. 192, 62 L.Ed.2d 124 (1979). For purposes of this summary judgment motion, this Court is willing to adopt such an expansive view of § 501.

The Court has already found that the disclosure of information via the released portions of the McKinsey & Co. report and via the "disclosure document" of August 19, 1983, satisfies a union member's right to an informed and meaningful vote. In addition, the Court would note that President Bish's efforts, together with other Independent Steelworkers Union officers, management representatives, and officers of the Independent Guard Union, via the Joint Study Committee must be viewed as reasonable. Through a competitive process, the Joint Study Committee selected McKinsey & Co., which enjoys an international reputation for expertise, to conduct its feasibility analysis. Reliance on the expert firm's findings, as well as its recommendations on the method and timing of information disclosed and information kept confidential cannot be said to be arbitrary, capricious, or in bad faith.

The Court earlier noted that officers of a union have a responsibility to lead and to give members the benefit of their advice on questions that arise and that judicial intervention should only occur when the official's action is not fair or reasonable. The Court is entirely satisfied that no cause of action under § 501 is stated as a matter of law.

SECURITIES ACTS ISSUES

■ In the Sixth Cause of Action of the Complaint, Plaintiffs attempt to state claims for alleged violations of federal securities laws. It is alleged that the 32% reduction in compensation recommended by the McKinsey & Co. report includes a 12% deferral of income in order to pay for the common stock of the successor corporation to Weirton Steel Division, and that this concept has been built in to the 18.38% reduction proposed by the Union leadership in April, 1983. It is further alleged that employees of the new corporation "would be required to purchase common stock in this manner," and that by mailing the McKinsey & Co. report and other documents (presumably including the "disclosure document"), Defendants have solicited Plaintiffs and others to buy such stock. Finally, Plaintiffs allege that requiring them to purchase stock while withholding the confidential appendix of the McKinsey & Co. report constitutes violations of the

anti-fraud provisions of the Securities Act of 1933 and the Securities and Exchange Act of 1934, specifically 15 U.S.C. §§ 77q and 78j and that certain of the Defendants are liable for the omissions pursuant to 15 U.S.C. § 77l. For the reasons expressed below, the Court is of the opinion that the Sixth Cause of Action fails to state a cause of action as a matter of law.

As the Court perceives the complaint, the issue here is the adequacy of information about a proposed employee stock ownership plan by which the stock of the employer would be transferred to the account of an employee pursuant to a defined plan. It is proposed that an ESOP trust will be created under the Internal Revenue Code. The major purpose of the trust is to acquire the stock of the new employee-owned company and, using the stock as collateral, borrow funds from lenders. The borrowed monies would be used to buy the assets of National's Weirton Division and to operate the new company. As the loans are repaid, stock of the new company would be released from its collateral role and allocated to the accounts of employees who satisfy a minimal hour of service requirement for each year of operation, in quantities equivalent to the individual employee's proportional share of compensation paid by new Weirton. See 26 U.S.C. § 4975(e)(7). Such arrangements are known as leveraged ESOPs. Brecher, Gray, Lazarus, The Function of Employee Retirement Plans as an Impediment to Takeovers, 38 Bus.Law. 503, 507–508 (1983). The trust also includes the mechanism for a tax credit employee stock ownership plan (labeled "PAYSOP"), which will permit new Weirton to take advantage of the tax credits available for such plans under 26 U.S.C. 44G. In years when Weirton elects to utilize the payroll based tax credit, it will make contributions to the ESOP trust which will be allocated to each employee on the basis of the individual's proportional share of compensation. See 26 U.S.C. § 409A. The Court notes that no participant in either aspect of the ESOP trust is required to make contributions; indeed, no employee is permitted to make contributions. All funding which will re-

sult in stock being allocated to an employee account must be made by the proposed new company.

In Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), the Supreme Court held the provisions of the Securities Act of 1933 and the Securities and Exchange Act of 1934 were inapplicable to a noncontributory, compulsory pension plan. (Technically speaking, the proposed ESOP at issue here, which is both noncontributory and involuntary, is a pension plan. 29 U.S.C. § 1002(2), Am.Jur.2d Pension Reform Act § 187. However, an ESOP differs somewhat from a regular pension plan providing benefits at retirement. The Daniel decision, while providing guidance on the issue here, is not viewed as dispositive.) The Securities and Exchange Commission appeared as amicus curiae in Daniel to urge that federal securities law did apply to such pension plans. In the wake of Daniel, the S.E.C. staff has issued two interpretive releases announcing the agency's position on regulation of employee benefit plans. 17 C.F.R. §§ 231.6188, 231.6281; 45 Fed.Reg. 8,960 (1980) (release no. 6188), 46 Fed.Reg. 8,446 (1981) (release no. 6281). It appears the current S.E.C. position is that registration of stock issued to employees under an ESOP (including tax credit plans like the proposed PAYSOP) need not be registered, 45 Fed.Reg. at 8,968, and that the anti-fraud provisions of the 1933 Act do not apply. Id. at 8,969. (Although the statutes controlling the PAYSOP, or tax credit employee stock ownership plan, have been amended since the S.E.C. release cited, the Court is of the opinion that the change from a capital investment based credit to a payroll based credit enacted in the Economic Recovery Tax Act of 1981 works no change on the principles underlying the agency's position. Given the structure of the PAYSOP at issue, registration of the plan is not necessary. Brecher, supra, 38 Bus.Law. at 506. See 46 Fed.Reg. at 8,448.)

Each of the statutes pleaded by Plaintiffs contemplates that an offer, sale, or purchase of securities has transpired. See Blue Chip Stamps v. Manor Drug Stores, 421

U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), *Bosse v. Crowell Collier and Macmillan,* 565 F.2d 602, 610 (9th Cir.1977), *Baker v. Data Dynamics,* 561 F.Supp. 1161, 1166 (W.D.N.C.1983). It is the opinion of the Court that no offer, sale, or purchase occurs with the operation of an ESOP as contemplated by the securities laws. Participation in the ESOP for employees of the proposed company is not voluntary, and is, in a sense, compulsory. Each participant who meets certain minimum hours of service requirements will have stock allocated to his or her account. Thus, there is no affirmative investment decision. More importantly, there is no furnishing of "value" by participating employees. *See* 15 U.S.C. § 77b(3). Instead of giving up some tangible and definable consideration, participants earn stock through labor for the employer. The notion that the exchange of labor will suffice to constitute the type of investment which the Securities Acts were intended to regulate was rejected in *Daniel, supra,* 439 U.S. at 559–561, 99 S.Ct. at 796–797. Plaintiffs theorize that part of the reduction in wages proposed for employees of the new company (as compared with wages for equivalent work under National Steel) satisfies the notion of consideration or value necessary to find a sale of securities under the federal Securities Acts. This is a strained interpretation of the situation. In rejecting this theory, the Court finds that the proposed ESOP is a method of deferring income, not reducing wages or paying for stock. *See* Am.Jur.2d *Pension Reform Act* § 187 (1975).

It might be said that the presentation of the options regarding the proposed employee buy-out of National's Weirton Division (including the ESOP) to Union membership for an election or the decision of an individual employee on whether to accept employment with the new employee-owned company or seek employment elsewhere is a "sale" within the meaning of the securities laws. Such was the holding of the court of appeals in *Daniel.* 561 F.2d 1223, 1242–1244. The Supreme Court's reversal (albeit without substantive comment on this notion) may indicate the demise of this theory.

Nonetheless, it is the opinion of the Court that failure of participants to exchange "value" or invest money at the time of making these decisions precludes a view that the Union election or the decision to accept employment constitutes a "sale."

The Securities Acts at issue were designed to protect investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, to promote ethical standards of honesty and fair dealing, to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), 15 U.S.C. § 78b. There is no mention of ESOPs in the Acts, except to exempt trust funds held by banks in connection with ESOPs. *See* 15 U.S.C. § 77c(a)(2).

In contrast, the Employee Retirement Income Security Act extensively regulates employee welfare benefit plans, such as employee stock ownership and other stock-bonus plans. For example, the Internal Revenue Code provisions of ERISA define the parameters of a qualified trust and describe certain anti-discrimination, non-forfeitability, and voting rights requirements for ESOPs. 26 U.S.C. §§ 401, 409A. The labor law provisions require regular reporting and disclosure to participants, and impose certain fiduciary duties on plan administrators. *See, e.g.,* 29 U.S.C. §§ 1021, 1104.

The employee welfare plan at issue here and that at issue in *Daniel* differ in several respects. However, it is the opinion of the Court that the Supreme Court's reasoning in *Daniel* with regard to the existence of comprehensive legislation governing the use and terms of employee welfare plans severely undercuts arguments for extending the applicability of the Securities Acts. 439 U.S. at 569–570, 99 S.Ct. at 801–802. In light of the extensive regulation of ESOPs under ERISA, the Court is not inclined to

endorse a theory extending Securities Acts coverage to the plans considered here. In summary, to the extent that the instant issue involves a Union leadership recommendation to membership and an election proposed to modify an existing collective bargaining agreement, the Court believes that comprehensive legislation governing such activities limits the extension of the applicability of Securities Acts to this sphere of labor relations.

For all the foregoing reasons, it is the opinion of the Court that on the limited issue under consideration, the Securities Acts are inapplicable to claims of inadequate information concerning a proposed employee stock ownership plan.

ORDER

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure. As announced orally at the conclusion of hearings of September 20–21, 1983, conducted on the instant motions, it is

ORDERED that the motions of Defendants Walter Bish, the Independent Steelworkers Union, and the Joint Study Committee, and of Defendants Loughhead, Valdiseri, Doepken, Madigan, and West for summary judgment are GRANTED. Further, it is

ORDERED that Plaintiffs' motion for preliminary injunction is DENIED. It is

ORDERED that this civil action be, and the same is hereby, DISMISSED and retired from the docket of the Court.