## IN RE CENDANT CORPORATION SECURITIES LITIGATION.

This document relates to:

**Jan Wyatt, Randy Kupper and Maria Lourdes Rodriguez, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Cendant Corporation, individually and as successor to CUC International, Inc., E. Kirk Shelton, Walter A. Forbes, Cosmo Corigliano, Christopher McLeod, Anne M. Pember, Burton C. Perfit, T. Barnes Donnelley, Stephen A. Greyser, Kenneth A. Williams, Bartlett Burnap, Robert P. Rittereiser, Stanley M. Rumbaugh, Jr., and Ernst & Young, LLP, Defendants.**

Civ.No. 98–1664(WHW).

United States District Court,
D. New Jersey.

Feb. 1, 2000.

Michael J. Pucillo, Colleen Bodik, West Palm Beach, FL, for Plaintiffs.

Douglas Eakeley, Peter Skolnik, Lowenstein Sandler, PC, Roseland, NJ, Alan Salpeter, Caryn Jacobs, Mayer, Brown & Platt, Chicago, IL, for Ernst & Young LLP.

Steven S. Radin, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Newark, NJ, Greg Danilow, Weil, Gotshal & Manges LLP, New York City, for CUC Directors/Walter Forbes.

Richard Schaeffer, Dornbush, Mensch, Madelstrom & Schaeffer, New York City, for E. Kirk Shelton.

Carl Greenberg, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Short Hills, NJ, Jonathan Lerner, Samuel Kadet, Skadden, Arps, Slate Meagher & Flom, New York City, for Cendant.

## OPINION

WALLS, District Judge.

Defendants, Cendant Corporation ("Cendant"), Ernst & Young LLP ("E & Y"), E. Kirk Shelton, Walter A. Forbes, and Christopher McLeod, move to dismiss the amended complaint filed against them by plaintiffs, Jan Wyatt, Randy Kupper, and Maria L. Rodriguez, on behalf of themselves and all others similarly situated. As stated in this Opinion, defendants' motions are granted.

### *Factual Background*

Plaintiffs are present and former employees of Interval International, Inc. ("Interval"), once a subsidiary of CUC International, Inc. ("CUC"). Am Compl. ¶ 28. In 1992, CUC's board of directors adopted a stock option plan for Interval employees (the "1992 option grant"). Beginning in 1993, senior management of Interval received options to purchase CUC common stock. These were given between 1993 and February 1997. Am Compl. ¶ 27. These options had a ten year life, and were fully vested within four to five years after their grant. *Id.* If the employee died or was disabled, the options would immediately vest and become exercisable. *Id.* If the employee terminated employment with CUC for other than death or disability, the options were exercisable to the extent exercisable on the date of termination for a period of four months thereafter.

The planned merger of HFS, Inc. ("HFS") and CUC to form Cendant Corporation was announced on May 27, 1997.[1] Management of CUC and Interval anticipated that Interval would have to be divested to obtain governmental approval of the merger. Am Compl. ¶¶ 28–30. And, on July

---

1. For more factual background on the merger and related litigation, see *In re Cendant Corp. Litigation,* 182 F.R.D. 144 (D.N.J.1998) and *In re Cendant Corp. Litigation,* 60 F.Supp.2d 354 (D.N.J.1999).

14, 1997, the Federal Trade Commission ("FTC") advised CUC that such divestiture of Interval was recommended. Under the terms of a consent order with the FTC, divestiture was a condition of merger approval. Am Compl. ¶ 31.

Interval's management worked to prevent their options from expiring within four months of divestiture under the terms of the 1992 option grant. To this end, Craig Nash, President and Chief Executive Officer of Interval, contacted CUC's management. On August 26, 1997, Mr. Nash sent a letter to Interval optionholders offering certain incentives "to encourage our continued efforts on behalf of Interval during this time of uncertainty and possible transition." Am. Compl. Ex. B. Employees were offered a "stay bonus" of $25,000, a guaranteed bonus for fiscal year 1998, and severance payment for employees terminated within one year of the anticipated divestiture. Am. Compl. Ex. B. Another "incentive" modified CUC stock options by retaining the original vesting schedule for all employees who remained at Interval for three months following the date of divestiture. Am. Compl. ¶¶ 34–36; Am. Compl. Ex. B. For those who left within three months, the proposal would have had options vest according to schedule within two years after divestiture; any options which vested after the two year period were forfeit. Am Compl. ¶ 35. No modifications to the ten year exercise period were proposed.

On October 29, 1997, a Stock Purchase Agreement ("SPA") was entered into between CUC as seller and Interval Acquisition Corporation as buyer of Interval. Am Compl. ¶ 37. Under section 5.2 of the agreement, all previously granted employee stock options were "to [immediately] vest and be exercisable for a period ending on the date which is one year from the date following the closing date." *Id.* No reference was made to the August letter to Interval employees which required them to remain at the company for three months after divestiture to receive the most favorable option modifications.

In reviewing the SPA, the Interval employees were concerned that a one-year option exercise period was too brief. Am Compl. ¶ 39. Craig Nash contacted CUC. The result was a December 10, 1997 letter which notified plaintiffs "of a change in terms which we have been able to secure for your outstanding CUC options:"

[P]rovided you are an employee of Interval on the Closing Date, all of your options to acquire shares of CUC common stock that you hold on the closing date which are not vested by their terms will be accelerated so that all such options will be vested as of the Closing Date. You will thereafter be permitted to exercise any of your unexercised options for a period of two years following the Closing Date.

Am. Compl. Ex. D.

On December 17, 1997, the date of the merger of HFS and CUC and divestiture of Interval, Interval Acquisition Corporation modified section 5.2 to allow for the two year exercise period. Am Compl. ¶ 41. Section 12.3 of the SPA stated that the document "contain[s] the entire agreement between the parties with respect to the subject matter hereof and [ ] there are no agreements, understandings, representations or warranties between the parties other than those set forth or referred to herein."

Plaintiffs, however, say that each employee also had the choice to be bound by the original 1992 option grant without the four month termination provision. *See* Am. Compl. Ex. D; Am Compl. ¶ 43. Thus, "[t]hose [employed by Interval on the date of divestiture] who did not modify the options to obtain immediate vesting [under section 5.2] ... were, in essence, given a waiver of the provisions of CUC's 1992 employee stock option plan which required that options be exercised within four months of termination or they would expire." Am. Compl. ¶ 43. According to plaintiffs, approximately four employees

chose not to modify and the rest altered their options pursuant to section 5.2 of the SPA. The four employees are not putative class members.

On April 15, 1998, Cendant announced that it had discovered accounting irregularities in former CUC business units. *See generally In re Cendant Corp. Litigation,* 60 F.Supp.2d 354 (D.N.J.1999). The next day, Cendant's stock fell approximately 47%, from $35 ⅝ per share to $19 ⅟₁₆ per share. Plaintiffs filed their complaint, later amended, which seeks to recover for the loss in value of their CUC (which by merger became Cendant) stock options.

The defendants ask the Court to dismiss the complaint for several reasons. Defendant Cendant Corporation argues that there was no purchase or sale of securities because (a) plaintiffs' claims are foreclosed under the "no sale" doctrine recently addressed by this Court in *In re Cendant Corporation Securities Litigation,* 76 F.Supp.2d 539 (D.N.J.1999) (*"McLaughlin"*) and (b) none of the modifications significantly altered the nature or risk of plaintiffs' investment. Second, the corporation argues that plaintiffs cannot allege loss causation. Defendant Ernst & Young LLP ("E & Y") also contends that (a) the option modifications were not purchases or sales of securities; (b) E & Y's March 1997 audit opinion was not made "in connection with" the option modifications and plaintiffs did not rely on the opinion; (c) plaintiffs fail to allege loss causation and (d) plead scienter with the particularity required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(2). Defendants Walter A. Forbes, Christopher K. McLeod, and E. Kirk Shelton adopt many of E & Y's arguments. These individual defendants further urge the Court to dismiss plaintiffs' Section 20(a) "control person" claims.

Plaintiffs respond by claiming to be "purchasers" under Section 10(b): They assert that the modifications were part of a bargained-for exchange negotiated on behalf of the Interval executives who remained at the company through divestiture. They argue that the executives provided consideration for the option modifications by remaining with Interval through divestiture. They further argue that two operative modifications, of August 26, 1997 and December 17, 1997, were "significant change[s] in the nature of the investment or in the investment risk" to qualify as purchases of "new investments." They assert that they have alleged loss causation because they "committed their labor in exchange for securities that were essentially worthless .... [and] ended up exchanging long term options for short term options that were largely worthless." Finally, plaintiffs aver that they have specified scienter and fraud with particularity against all defendants.

## *Analysis*

### A. Motion to Dismiss

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the nonmoving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-plead allegations as true for the purposes of the motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *See Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed.

R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 at 299 (2d ed.1990).

## B. Section 10(b) and Rule 10b–5

As the Court has written, *see In re Cendant Corp. Litig.,* 60 F.Supp.2d 354 (D.N.J.1999); *see also Kennilworth Partners LP v. Cendant Corp.,* 59 F.Supp.2d 417 (D.N.J.1999); *P. Schoenfeld Asset Management LLC v. Cendant Corp.,* 47 F.Supp.2d 546, 552 (D.N.J.1999), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. It is unlawful to "employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. 15 U.S.C. § 78j(b). To implement the statute, the SEC enacted Rule 10b–5, violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see also In re Cendant Corp. Litig.,* 60 F.Supp.2d at 367–68. That Rule makes it unlawful: (1) "[t]o employ any device, scheme, or artifice to defraud," (2) "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17

C.F.R. § 240.10b–5. The Supreme Court limited standing to bring a private cause of action under Rule 10b–5 to actual purchasers or sellers of securities. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.

### 1. Purchase or Sale

Because only a seller or purchaser of a security may bring an action under either § 10(b) of the Securities Exchange Act of 1934 or Rule 10b–5, the "mere retention of securities in reliance on material misrepresentations or omissions" cannot form the basis of a securities fraud claim. *See Krim v. BancTexas Group,* 989 F.2d 1435, 1443 n. 7 (5th Cir.1993) (citing *Blue Chip Stamps,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539). "Significant modifications in the rights of security holders may constitute a 'sale' of one security and the 'purchase' of another," however, even if no actual exchange takes place. *Abrahamson v. Fleschner,* 568 F.2d, 862, 868 (2d Cir.1977); *see also Rathborne v. Rathborne,* 683 F.2d 914, 921 (5th Cir.1982) (holding that share exchange in spinoff was not a sale of securities because there was no "fundamental change in the nature of the shareholder's investment"). Here, plaintiffs do not claim that their initial acquisition of CUC options was the triggering "purchase or sale" under the Exchange Act; rather, they claim that option modifications of August 1997 and December 1997 were "purchases or sales." *See* Pl. Brf. at 7–8. According to plaintiffs, their options were significantly changed in two ways: (1) the August modification resulted in "the waiver of the [four month] termination provision," Pl. Brf. at 8; and (2) the December 1997 modification vested the options immediately and shortened the exercise period from ten years to two.

### a. "No Sale" Doctrine

Defendants deny that plaintiffs, as recipients of options under an employee stock option plan, "purchased" them.

They rely heavily on this Court's recent *McLaughlin* decision that an employee-participant in a compulsory, noncontributory option plan was not a Section 10(b) securities purchaser. *See* 76 F.Supp.2d 539, 544–45. Plaintiffs answer that, unlike *McLaughlin* where plaintiff "did not receive her options as part of a bargained-for exchange that required her to make an affirmative investment decision," they repeatedly negotiated with CUC to remain as Interval employees in return for favorable option modifications and chose to remain with the company based on these changes. Am. Compl. ¶ 6 ("Plaintiffs and others similarly situated agreed to remain employees of post-Divestiture Interval due to the modification of their rights and obligations with respect to the Options"); Pl. Brf. at 6. Plaintiffs assert that this bargain was first reflected in the August 1997 letter sent to Interval employees. Defendants counter that the August letter, though apparently the subject of some negotiation by Mr. Nash on behalf of optionholders, did not result in any actual changes. They look to section 5.2 of the October 1997 SPA which made no mention of the August letter and unilaterally modified the Interval/CUC options to provide that employee stock options were "to vest and be exercisable for a period ending on the date which is one year from the date following the closing date." Am Compl. ¶ 37. Defendants also claim that plaintiffs gave no value for these modifications by simply remaining in Interval's employ.

*Noncontributory plan: Was there a "quid pro quo"?*

 To "purchase or sell" stock options, employee-purchasers must "give up a specific consideration in return for a separable financial interest with the characteristics of a security." *Foltz v. U.S. News & World Report, Inc.,* 627 F.Supp.

1143, 1157–58 (D.D.C.1986) (citing *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 559, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979)). Conversely, "[w]hen an employee does not give anything of value for stock other than the continuation of employment nor independently bargains for such stock," there is no "purchase or sale" of securities. *See McLaughlin,* 76 F.Supp.2d 539, 544 (citing *Compass Group PLC,* SEC No–Action Letter, 1999 WL 311797 (May 13, 1997)).

Plaintiffs rely on cases in which an employee was found to have "purchased or sold" stock options in return for labor. *See, e.g., Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 560 (2d Cir.1985); *Rudinger v. Insurance Data Processing, Inc.,* 778 F.Supp. 1334 (E.D.Pa.1991); Pl. Brf. at 6. These decisions are based on the concept that the options are "a *quid pro quo* offered to induce plaintiff to enter into the employ of [defendant]." *Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass.1972). Plaintiffs' pleadings in the present case, however, do not fall within these precedents. Unlike *Yoder* and *Rudinger,* where the employee changed his employment status in return for individually bargained-for compensation including stock options, the *Wyatt* plaintiffs remained as at-will Interval employees with the same responsibilities and compensation they had pre-divestiture.[2] *See generally McLaughlin,* 76 F.Supp.2d 539, 544–45 (discussing *Yoder* and *Rudinger*). Their circumstance does not change even if the Court adopts plaintiffs' argument that the rejected August proposal granted certain modifications to those who remained in the employment of Interval for three months following divestiture.

Consequently, plaintiffs do not plead the existence of any "specific consideration" or added value that they each provided in the

---

**2.** That the employees may have received cash bonuses does not aid the determination of whether they "purchased" options.

pre-divestiture period traceable to the option modifications. *See Bauman v. Bish,* 571 F.Supp. 1054, 1064 (N.D.W.Va.1983) (finding no purchase or sale because "participants [in the option plan] gave up no tangible, definable, specific value in exchange for the stock"). Plaintiffs have not plead that they "changed [their] way of life and [their] job—in return for the stock and stock options available through the plan." *Dubin v. E.F. Hutton Group, Inc.,* 695 F.Supp. 138, 146–47 (S.D.N.Y.1988); *see also Yoder,* 751 F.2d at 560 (finding that employee "part[ed] with his or her established way of life in return for a contract to issue stock").[3] Neither did plaintiffs "g[i]ve up part of their [existing] compensation package-a specific percentage of their wages-in exchange" for the option modifications. *See Hood v. Smith's Transfer Corp.,* 762 F.Supp. 1274, 1290 (W.D.Ky. 1991). Rather, it appears from the complaint that their compensation remained the same, possibly supplemented by certain bonuses. Am. Compl. Ex. B. Thus, "[l]ooking at the economic realities, it seems clear" that, at most, these employees "sold" their labor primarily to obtain a livelihood, not to make an investment. *See Daniel,* 439 U.S. at 560, 99 S.Ct. 790.

*Compulsory plan: Was there a voluntary "investment decision"?*

■ To resay, an employee-participant in a compulsory, noncontributory option plan is not a purchaser of securities under Section 10(b). *See McLaughlin,* 76 F.Supp.2d 539, 544–45. The Court has concluded that the *Wyatt* plaintiffs fail to plead that they contributed anything of value in return for the modifications. *See supra* Part B.1(a). The remaining issue is whether the modifications were involuntary or "compulsory."

■ A hallmark of a "voluntary" plan is the ability of the employee to make an "investment decision" to acquire the stock options. *See generally McLaughlin,* 76 F.Supp.2d 539, 544 (citing *Bauman v. Bish,* 571 F.Supp. 1054 (N.D.W.Va.1983)) (an option plan is compulsory where there is no affirmative investment decision by the individual employee). "Where an employee or potential employee acquires the right to options as part of his or her bargained-for compensation, courts will infer that the employee made an intentional decision to 'purchase' the options." *Id.* 76 F.Supp.2d 539, 543 (citing *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 560 (2d Cir.1985); *Rudinger v. Insurance Data Processing, Inc.,* 778 F.Supp. 1334, 1338 (E.D.Pa.1991)). Specifically, there must be an *"individual affirmative decision* to give up a particular consideration in return for a financial interest." *See Childers,* 688 F.Supp. at 1363 (emphasis added). *See generally* Mario Baeza & Laura Taylor, *The Applicability of Federal Securities Laws to Employee Bargained–For ESOPs,* 680 PLI/Corp. 703, 709–13 (Feb.1990).

Despite the absence of any cognizable *quid pro quo,* plaintiffs argue that the option modifications were "voluntary," in that they each made an affirmative "investment decision" to accept the modified options. For support, they rely upon the December 10, 1997 letter which arguably gave them the ability to accept or reject the modifications later embodied in section 5.2 of the final SPA. Am. Compl. ¶ 43 (stating that plaintiffs chose to accept the modifications but four other employees did not); Ex. D at 2. This argument mischaracterizes what constitutes a voluntary "investment decision."

■ When a group of employees is offered options (or option modifications), an eligible employee does not make an individual affirmative "investment deci-

---

3. Plaintiffs' vague, conclusory allegation that "key management personnel at Interval were being recruited" does not allow the Court to conclude plaintiffs had concrete alternatives to remaining at Interval. Am Compl. ¶ 32.

sion" if he or she chooses either to participate in the plan or to reject it. *Cf. Childers v. Northwest Airlines, Inc.*, 688 F.Supp. 1357, 1363 ("Plaintiffs' participation was an incident of employment and their only choice would have been to forego the receipt of benefits entirely"); *see also Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir.), *cert. denied*, 525 U.S. 920, 119 S.Ct. 274, 142 L.Ed.2d 226 (1998). Such is the case here. The only alternatives available were pre-ordained by CUC. Plaintiffs did not make any *"individual affirmative decision[s]"* to trade "particular consideration in return for a financial interest" merely because they plead that they could have accepted a different form of modification. *See Childers*, 688 F.Supp. at 1363 (emphasis added).

In another attempt to enforce the argument that each made an "investment decision," plaintiffs point to the negotiations conducted on their behalf by Craig Nash; they remonstrate that they had the ability to shape the terms of their plan rather than merely accept or reject offered modifications. This argument is overbroad. Even if the terms of a collective option plan are bargained for by a representative on behalf of potentially participating employees, a plan is not voluntary. *See, e.g., Daniel*, 439 U.S. at 553, 99 S.Ct. 790 (declining to find a sale where union representatives negotiated the terms of an employee option plan). The admittedly collective bargaining here negates the existence of any individual, voluntary investment decision. The option modifications were "guaranteed" to any who chose to take them, *see Dubin*, 695 F.Supp. at 145; plaintiffs could either accept or reject them and had nothing to do in return.

### C. Section 20(a) Claims

■ Section 20(a) of the Exchange Act creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a), and imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Securities Exchange Act of 1934. To maintain a claim under Section 20(a), the plaintiff must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and (3) that they were "in some meaningful sense culpable participants in the fraud." *Rochez Brothers v. Rhoades*, 527 F.2d 880, 885 (3d Cir.1975) (quoting *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973)); *see also McLaughlin*, 76 F.Supp.2d 539, 548, 550 n. 5.

■ Plaintiffs plead underlying violations of Section 10(b) of the Exchange Act by Cendant, the controlled entity, and allege that various defendants acted as "controlling persons" of Cendant within the meaning of Section 20 of the Exchange Act. The Court, however, need not address these allegations. Plaintiffs' Section 10(b) claims, necessary underpinnings of Section 20(a) status, have been dismissed for lack of standing. It follows then that plaintiffs' Section 20(a) claims must be and are dismissed. *See Gunter v. Ridgewood Energy Corp.*, 32 F.Supp.2d 166, 178–79 (D.N.J. 1998); *see also generally Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.1992); *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F.Supp.2d 417, 430 (D.N.J.1999); *McLaughlin*, 76 F.Supp.2d 539, 548.

### Conclusion

Defendants Cendant, E & Y, E. Kirk Shelton, Walter A. Forbes, and Christopher McLeod's motions to dismiss the complaint's Section 10(b) claims are granted. Defendants E & Y, E. Kirk Shelton, Walter A. Forbes, and Christopher McLeod's motions to dismiss plaintiffs' Section 20(a) claims are granted.

### ORDER

Defendants, Cendant Corporation ("Cendant"), Ernst & Young LLP ("E & Y"), E. Kirk Shelton, Walter A. Forbes, and Christopher McLeod, move to dismiss the amended complaint filed against them

by plaintiffs, Jan Wyatt, Randy Kupper, and Maria L. Rodriguez, on behalf of themselves and all others similarly situated. Having heard oral argument on January 24, 2000 and for good cause shown;

It is on this day of January, 2000:

ORDERED that defendants' motions to dismiss the complaint's Section 10(b) claims are granted, it is further

ORDERED that E & Y, E. Kirk Shelton, Walter A. Forbes, and Christopher McLeod's motions to dismiss plaintiffs' Section 20(a) claims are granted.